**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MICHAEL P. YOUNG,                                    *

Plaintiff                                                      *

v                                                                 *                    Civil Action No. ELH-13-1403

WAYNE WEBB, et al.,
Defendants                                            *
                                                                ***

<u>**MEMORANDUM**</u>

Michael P. Young,[1] the self-represented plaintiff, is a former Maryland prisoner.  *See*
ECF 29.  He filed suit against a host of defendants, under 42 U.S.C. § 1983, alleging that on
February 1, 2012, while he was incarcerated at the Maryland Correctional Institution-
Hagerstown ("MCI-H"), he was assaulted by correctional staff.  ECF 1.  The defendants are
Correctional Officer ("CO") II Shane Boggs; Correctional Security Chief Ronald R. Brezler; CO
II Ronald Mills; CO II Joshua Snyder; Commissioner J. Michael Stouffer; Acting Lieutenant
Steven Thomas; CO II Wesley Unger; Warden Wayne Webb; and CO II Cole Young.  Plaintiff
appended several exhibits to his Complaint.

Defendants have jointly filed a motion to dismiss or for summary judgment, supported by
multiple exhibits.  ECF 21.  Plaintiff has responded.  *See* ECF 24; ECF 26.  No hearing is
necessary to resolve the matter. *See* Local Rule 105.6.   For the reasons that follow, defendants'
motion, construed as a motion for summary judgment, shall be granted.

**Background**

Plaintiff claims that on February 1, 2012, Snyder came to plaintiff's cell and opened the
cell door, without first placing plaintiff in restraints, and asked plaintiff to step out of the cell.

---

[1] In the case caption, plaintiff identified himself as Michael P. Young.  But, in the body
of his Complaint, ¶ 3, he referred to himself as Michael P. Young, **Jr.**

When plaintiff stepped out of the cell Snyder directed him to turn around so that he could apply handcuffs.  ECF 1.  Plaintiff states that he complied with the request and handed Snyder his right arm first, but Snyder stated, "left arm first."  *Id.* at 5.[2]  As plaintiff gave Snyder his left arm, Snyder was about to place the handcuffs on top of plaintiff's watchband.  Plaintiff reports that he had several watchbands broken in this manner so he "politely" asked Snyder to place the cuff under the watch, closer to plaintiff's wrist, because if the cuffs were placed above the watchband they would cut into his wrist.  Plaintiff reports that Snyder became irate and began screaming, "Do not f---ing tell me how to do my job! Turn around!" *Id.*  Snyder than grabbed plaintiff's arm and attempted to throw him into the wall.  Plaintiff states that he asked Snyder what he was doing and advised that he was "not resisting." *Id.*

According to plaintiff, Snyder then made statements about an Administrative Remedy Procedure request ("ARP") that plaintiff had filed with respect to other officers.  He threatened plaintiff that if he continued to press forward with his complaint against Sgt. Wynkop, plaintiff would be "sorry." *Id.*  Plaintiff states that he then advised Snyder to return him to his cell because he did not "trust" Snyder. *Id.*  According to plaintiff, Snyder then applied mace directly to plaintiff's face.[3]  Plaintiff states that he backed away from Snyder with his hands up, palms out, stating:  "I'm not resisting." *Id.*  Plaintiff claims that he could hardly see or breathe and his face felt as though it were "on fire." *Id.*  At this time, he was punched in the face and heard a "Signal 13" (staff in need of assistance). *Id.*

---

[2] I have used ECF page numbers, which do not necessarily correspond to the page numbers in the parties' submissions.

[3] Defendants assert that mace is not used in Maryland prisons.  Instead, the prisons use pepper spray.  Although pepper spray is commonly called mace, they are not the same, according to defendants.  *See* ECF 21-1 at 2 n.1.  Nevertheless, I shall use plaintiff's terminology when recounting his version of events.

Plaintiff reports that he was tackled to the ground, and in the fetal position to protect himself, while Snyder continued to punch him.  *Id.* at 6.  As plaintiff's vision cleared, he saw Officers Mills, Boggs, Unger, and Thomas responding to the call for assistance.  Plaintiff states that he tried to stand up, with his hands in the air, and, in an effort to avoid the assault he felt was coming from the responding officers, said:  "I'm not resisting."  *Id*.

According to plaintiff, Unger again tackled him to the ground. As plaintiff was on his knees one of the officers maced him again.  Plaintiff's hands were forced behind his back and he was handcuffed. He reports that he was then stomped, kicked, and punched, for what "felt like an eternity."  *Id*.  He also claims that he was struck multiple times in the back of his skull with the mace can.  *Id*.

Plaintiff alleges that he was "in and out of consciousness" and was transported to the medical department at MCI-H, where he was taken to a back room and was beaten again.  *Id*.  He reports that he was "to the point of almost losing consciousness," *id.* at 6-7, but he heard one of the defendants say, "Wake him up, pick him up and sit him in this chair!"  *Id.* at 7.  He was then smacked "very hard" in the face twice and was picked up and placed in a chair. *Id*.

Young reports that he was examined by a nurse, who had him stand over the water fountain and splash his eyes.  He was then put back in the chair where one of the defendants poked him in his left eye.  *Id*.

Plaintiff asserts that, as a result of the assault, his face and head were "swollen beyond recognition."  *Id*.  He reports that his left eye was closed for a week and a half and he could not see out of his left eye for three months.  He also received five staples in the back of his skull, and opines that this injury could not have occurred from a human fist or from hitting his head on the

concrete floor.  *Id.* at 6.  In Young's view, the wound is consistent with contact from a hard object, such as a mace can.  *Id*. at 6.

After the assault, plaintiff was transferred to the North Branch Correctional Institution ("NBCI").  *Id.* at 7.  He claims that he unsuccessfully attempted to have the assault investigated by headquarters, the Internal Investigation Unit, and by filing ARPs.  He recounts that he was harassed by officers at NBCI via excessive "shake downs" of his cell, destruction of his property, harassment, and tampering with his outgoing and incoming mail.  *Id*.  In addition, plaintiff states that, as a result of false accusations made against him, he was denied visits with his wife.

Further, Young alleges that officers came to his cell door in an effort to provoke fights, calling him racist names.  *Id.* at 8.  He asserts that "there is a brotherhood of correctional officers, who call themselves, 'The Brotherhood of Darkness,' with which they harass and victimize prisoner's [sic]."  *Id*.

Plaintiff also maintains that medical staff at NBCI refused to find a way to stop his headaches, which worsened.  *Id.*  He claims that he placed sick call slips but he still suffers from headaches and nothing has been done. He complains that while at NBIC he was not seen by a specialist.  *Id*.

The version of events offered by defendants differs dramatically.[4]  Snyder avers that on February 1, 2012, he was assigned as an escort officer to the Antietam Housing Unit ("AHU") at MCI-H, which houses inmates assigned to administrative and disciplinary segregation.  Ex. A, ECF 21-2 at ¶ 2.  At approximately 9:00 a.m., Snyder went to plaintiff's cell, C-15, in order to put him in restraints and escort him to a medical appointment.  *Id*. Snyder avers that he handcuffed plaintiff behind the back through the slot in the cell door, using two sets of handcuffs

---

[4] Defense counsel characterizes plaintiff's account as "hyperbolic" and "an outright fabrication."  ECF 21-1 at 3.

linked together, in compliance with a medical order that plaintiff be restrained in that way. *Id.* When the cell door opened, plaintiff stepped out of the cell, dropped his hands to his side, and the handcuffs fell to the floor.[5]  Plaintiff "charge[d]" at Snyder. *Id.* ¶ 3. Snyder stepped back, pulled his can of pepper spray from his belt, and attempted to spray plaintiff's face, but the spray did not work. *Id.*

According to Snyder, plaintiff knocked him to the ground. *Id.* ¶ 4.  Snyder stood up to defend himself and plaintiff threw him against a cell door, ripping Snyder's shirt, and began hitting Snyder "with closed fists." *Id.*  Snyder fought back, striking plaintiff several times. *Id.* Snyder recalls that other correctional officers arrived on the scene to assist in securing plaintiff. *Id.* ¶ 5.  Sgt. Thomas sprayed pepper spray in plaintiff's face, and plaintiff stopped fighting. Young was then escorted off the tier. *Id.*

Snyder avers that he does not know how plaintiff sustained the laceration to his scalp. *Id.* ¶ 6.  He observed no other injury to plaintiff when the incident was over.  Snyder suffered a bloody nose, a knot on top of his head, and abrasions to his chest. He was also exposed to the pepper spray. *Id. See also* ECF 21-3, Ex. B.

Snyder recalls that plaintiff told him several weeks prior to the incident that he did not like him. *Id.* ¶ 7.  Snyder does not know why plaintiff said this, but indicates that it is possible he had previously written a ticket on plaintiff. *Id.*  Snyder avers that on February 1, 2012, his actions were taken "in a good faith effort to defend [him]self from Plaintiff's assault, and to maintain order and discipline." *Id.* ¶ 8.

Thomas asserts that he was in the control center of the AHU at the time of the incident and, through the Control Center windows, he saw plaintiff engaged in a physical altercation with

---

[5] A photograph of the handcuffs taken after the incident shows that double cuffs were used and one of the wrist restraints is in an open position.  ECF 21-8, Ex. G.

Snyder.  Ex. B, ECF 21-3 at ¶ 2.  Thomas ran to the location of the altercation and observed

Snyder in distress, having been knocked to the ground by plaintiff.  *Id.*  He gave plaintiff several

direct orders to stop resisting, but plaintiff ignored the orders and continued resisting the

officers' efforts to handcuff him.  *Id.*  Thomas then applied a burst of pepper spray directly into

plaintiff's face.  *Id.*  At that point, CO II Young handcuffed plaintiff.  *Id.*  Further, Thomas avers

that the scene of the incident was preserved and photographed and the ventilation system was

used to clear the odor of the pepper spray.  *Id.* ¶ 4.

C.O. Mills states that he was working escort duty in AHU on the date of the incident, and

was "watching walk cages" when he heard the call for assistance.  Ex. C, ECF 21-4 at ¶ 2.  When

Mills arrived on the tier he observed plaintiff in a "combative state," yelling and punching

Snyder, who was on the floor.  *Id.*  "He took Plaintiff to the floor to try to get control of him."

*Id.*  Thomas ordered plaintiff to stop fighting, but plaintiff did not comply.  Then, Thomas

"administered a burst of pepper spray to Plaintiff's face."  *Id.*  As a result, Mills, Thomas, and

Young were able to restrain plaintiff.  *Id.*

C.O. Shane Boggs reports that he was assigned to AHU on the date of the incident.  Ex.

D, ECF 21-5 at ¶ 2.[6]  He responded to the call for assistance and saw plaintiff "throw several

punches" at Snyder.  *Id.*  He and Mills tackled plaintiff in an attempt to handcuff him, but

plaintiff remained "combative."  *Id.*  However, plaintiff calmed down after Thomas administered

pepper spray.  *Id.*  Boggs reported that he experienced some ill effects from exposure to pepper

spray but was otherwise uninjured in the incident.  *Id.* ¶ 3.

C.O. Cole Young avers that he was working as a physician's assistant escort in the AHU

on the date of the incident.  Ex. E, ECF 21-6 at ¶ 2.  When he heard a Signal "10-13," he ran to

---

[6] Boggs's Declaration is unsigned.

the scene of the incident.  *Id.*  As C.O. Young arrived on the scene he observed that plaintiff had been pepper sprayed and was on the floor but restraints had not been applied.  *Id*.  C.O. Young ordered plaintiff to place his hands behind his back.  *Id*.  When the spray took effect C.O. Young, with the assistance of Mills and Boggs, was able to secure the handcuffs on plaintiff.  *Id*.  C.O. Young assisted plaintiff to his feet, escorted plaintiff to the medical unit, stayed with plaintiff the entire time he received treatment, and then transported him to a holding cell, without further incident.  *Id*.

Thomas and Young both saw that plaintiff was bleeding from the back of his head and experiencing the effects of the pepper spray.  *See* ECF 21-3, Ex. B; ECF 21-6, Ex. E.  Like Snyder, Thomas, Mills, Boggs, and Young assert that they acted in good faith to protect Snyder from plaintiff and/or to restore order and security to the institution.  *See* defense exhibits B, C, D, and E.

Correctional Officer Wesley Unger avers that he was not involved in the incident on February 1, 2012, as he was not present in AHU.  Rather, he had been assigned to the B Tier in MCI-H's main building on that date.  Ex. F, ECF 21-7 at ¶ 2.  Moreover, none of the other responding officers reported his involvement in the incident.  *See* defense exhibits A, B,C,D & E.  Additionally, the Internal Investigation Unit ("IIU") investigator noted that there were two officers with the surname Unger, neither of whom was assigned to plaintiff's unit at the time of the incident.[7]  Ex. G, ECF 21-8 at 14, 100.

---

[7] Plaintiff notes that Wesley Unger is listed in the serious incident report generated as a result of the altercation.  ECF 1.  The narrative to which he refers indicates "Cole Young COII and Wesley Unger COII reported possible blood exposure, pepper spray and related injuries. . . ."  *See* Ex. G, ECF 21-8 at 74; *see id.* at 77, 81; *see also id.* at 9 (reporting that Unger took plaintiff "off his feet").  The court can only conclude that Unger was misidentified in the report.

Based on the tier logs, Unger was not assigned to plaintiff's tier on the date of the incident.  *Id.* at 100.  Moreover, he avers that he had nothing to do with the incident.  Ex. F, ECF

Contrary to plaintiff's claim that his efforts to have the matter investigated were unavailing, his claims regarding the use of force were fully investigated by IIU. *See* ECF 21-8, Ex. G. Snyder, Thomas, Mills, Boggs and Young were all interviewed during the investigation. Their statements and reports of the incident, prepared close in time to the incident, comport in material respect with their representation of events provided to the court in their affidavits. *Id.*

Young identified inmate Charles Tussing as a witness to the events, and the IIU investigator interviewed Tussing. However, Tussing advised that he did not know plaintiff and knew nothing about the incident. Ex. G, ECF 21-8 at 13.

Plaintiff's cellmate, Justin Parker, was also interviewed by IIU. *Id.* at 13-14. Parker stated that he was standing by his cell door when plaintiff said to him, "I have a feeling that something's going to happen." *Id.* at 14. Parker offered that plaintiff had a pass to the dentist and that plaintiff and Snyder "never got along." *Id.* Parker added that Snyder "took" plaintiff's shower several weeks before. *Id.*[8] In contradiction of plaintiff's version of events, Parker stated that when Snyder was applying the handcuffs, before the cell door was opened, words were exchanged between plaintiff and Snyder regarding placement of the handcuffs. *Id.* Parker stated that when the door opened Parker observed plaintiff and the officer go to the floor. According to Parker, Snyder used pepper spray, then threw the can at plaintiff. Further, Parker noted it took

---

21-7. Notably, in plaintiff's initial complaint, he stated he could not identify the officers who arrived on the scene due to his exposure to pepper spray in his eyes. *See* Ex. G, ECF 21-8 at 5-6, 15. None of the other reports generated as a result of the assault refer to Unger, and none of the other responding officers make any reference to him. Ex. G, ECF 21-8 at 7, 10-14, 33-38, 61-73, 86-90. There are no photographs of Unger after the incident, as there are of other officers. Additionally, Unger did not prepare a report of the incident, unlike every other officer involved in the incident. *Id.* at 10-14, 33-38, 61-73, 86-90.

[8] Presumably, Parker meant that Snyder had previously sanctioned plaintiff with loss of shower privileges.

three officers approximately a minute "to pull [plaintiff] off of the officers." *Id*.  Parker did not observe any other officers use pepper spray.  *Id*.

Notably, Young was provided medical care immediately after the incident. *Id*. at 43-46. A laceration described as "superficial" and measuring 3.4 x .02 cm on the back of plaintiff's head was cleansed and stapled.  *Id*. at 45.  Plaintiff complained only about "mase" in his eyes, *id*. at 45, and eye care was provided.  *Id*. at 43-46.  His head and face were normal in appearance. No bruises, cuts, or swelling shut of plaintiff's eye were observed.  Plaintiff made no complaints to medical staff of eye-gauging, being unable to see out of his left eye, or of extreme headache. *Id*.  A photograph was taken of him.  *Id*. at 47.

Plaintiff was transferred to NBCI shortly after the incident.  Color photographs were taken of him upon his arrival at NBCI, approximately four hours after the incident. The photographs show no sign of injury, other than the injury to his scalp.  *Id*. at 18-27.  The nurse noted the 5 staples on the back of plaintiff's head and observed that his left ear and eyes were red.  She also observed small scratches to his forehead.  *Id*. at 16-17.  But, she indicated that, during plaintiff's intake screening, plaintiff had no medical, dental, or mental health complaints and there was no evidence of abuse or trauma at the time of the evaluation.  *Id*.

As a result of the incident, plaintiff was charged with violations of Rules 100, 101 and 116.  On February 9, 2012, he was found guilty of these disciplinary infractions.  Ex. G, ECF 21-8 at 28-31.  The Hearing Officer stated that plaintiff "offered a defense which this [Hearing Officer] found wholly not credible with an apparent hastily concocted version of the incident." *Id*. at 30.  The Hearing Officer found plaintiff removed his handcuffs and attacked staff. Sanctions were imposed. *Id*.  The decision of the Hearing Officer was upheld by Warden Shearin.  *Id*. at 32.

Plaintiff was also charged criminally by the State of Maryland.  He pled guilty in the District Court of Maryland for Washington County to the offense of second degree assault upon Snyder and was sentenced to a consecutive sentence of one year and one day.  *Id*. at 15, 105-06.

Based on the interviews conducted by IIU, and the absence of medical or other evidence to corroborate plaintiff's allegations as to the assault, IIU closed the case. Ex. G, ECF 21-8 at 15.

## Standard of Review

Defendant's motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  ECF 19.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

A court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.  *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by

extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").  However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin*, 149 F.3d at 261.

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Id.* at 149.  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery."  *E.I. de Nemours and Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 448-49 (4th Cir. 2011).   However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'"  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration

pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).[9]

Plaintiff filed a Declaration, which the court construed as a motion for discovery. ECF 26. He indicated that, due to his incarceration at a different institution, he was unable to secure affidavits from inmates who witnessed the incident. He also indicated he was unable to obtain a copy of Division of Correction "Use of Force Manual." Thereafter, on January 21, 2014, plaintiff notified the court of his change of address. ECF 29. By all appearances, by that date, plaintiff was no longer incarcerated. On April 3, 2014, noting that plaintiff had been released from confinement and therefore his impediment to securing the affidavits was resolved, and also noting that plaintiff offered no explanation as to how any of the evidence sought would have assisted him in opposing the dispositive motion, the discovery motion was denied, without prejudice. ECF 30. Plaintiff filed nothing further with the court. Given plaintiff's earlier submission of exhibits with his Complaint and his failure to file any additional motions or affidavits in opposition to the defendants' motion, I am satisfied that it is appropriate to address the defendant's motion as one for summary judgment, as this will facilitate resolution of the case.

---

[9] "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)). "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). But, the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nevertheless, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting

13

*Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation*, 477 U.S. at 323–24).

**Discussion**

A.  Respondeat Superior

Plaintiff's complaint against Warden Wayne Webb, Commissioner J. Michael Stouffer, and MCI-H Chief of Security Ronald R. Brezler is based solely upon the doctrine of *respondeat superior,* which does not apply in §1983 claims.  *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983). Liability of supervisory officials must be "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) (*citing Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984)).

Supervisory liability under § 1983 must be supported with evidence that (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff, (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).  Plaintiff has pointed to no action or inaction on the part of the Commissioner, the Warden, or the Chief of Security that resulted in a constitutional injury.  Accordingly, his claims against them shall be dismissed.

B.  Excessive Force

To proceed under 42 U.S.C. § 1983, a plaintiff must allege a violation of a federal constitutional right or a right secured by federal law.  *Baker v. McCollan*, 443 U.S. 137, 140 (1979).  To state a claim under § 1983, a plaintiff must: 1) "allege the violation of a right secured by the Constitution and laws of the United States"; and 2) "show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir.), *cert. denied*, ____ U.S. ____, 132 S. Ct. 112 (2011).

A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment.  *See Whitley v. Albers*, 475 U.S. 312, 391-21 (1986); *see also Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per curiam); *Hudson v. McMillan*, 503 U.S. 1, 7-9 (1992).  The use of force by a prison officer violates an inmate's Eighth Amendment rights when such force is "inconsistent with contemporary standards of decency," *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), or is "'repugnant to the consciousness of mankind.'"  *Wilkins*, 559 U.S. at 38 (citation omitted).

The Eighth Amendment inquiry is focused on whether the "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U. S. at 7.  Multiple factors are relevant to the inquiry.  They include the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *See Whitley*, 475 U. S. at 321.

The Supreme Court has made clear that "not 'every malevolent touch by a prison guard gives rise to a federal cause of action'" under the Eighth Amendment. *Wilkins*, 559 U.S. at 37 (citations omitted).  Conversely, the absence of "significant" injury is not dispositive of a claim of excessive force.  *See Wilkins*, 559 U.S. at 36-37.  But, the extent of an inmate's injury is one factor indicative of whether the force used was necessary in a particular situation.  Moreover, if force is applied maliciously and sadistically, liability is not avoided "merely because [the plaintiff] had the good fortune to escape without serious injury."  *Id*. at 37.  Put another way, there is no "de minimis" level of injury that is an acceptable result of excessive force under the Eighth Amendment.  *Id.* at 38-40.

In regard to the use of pepper spray by prison officers, "'[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas, or other chemical agents in quantities greater than necessary or for the sole purpose of inflicting pain.'" *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996)) (emphasis omitted).  However, pepper spray is not "per se a cruel and unusual punishment," *McCargo v. Mister*, 462 F. Supp. 813, 818 (D. Md. 1978), and can be used to "control a recalcitrant inmate" without violating the Eighth Amendment.  *Williams*, 77 F.3d at 763.

There are three general areas in which courts have held that use of pepper spray or other chemical agents may constitute excessive force in violation of the Eighth Amendment.  First, an Eighth Amendment violation has been found when an officer used far more than a reasonable quantity of a chemical agent.  *See, e.g.*, *Furnace v. Sullivan*, 705 F.3d 1021, 1025 (9th Cir. 2013) (finding Eighth Amendment violation where officer discharged can of pepper spray until empty, and another officer joined in); *Lawrence v. Bowersox*, 297 F.3d 727, 732 (8th Cir. 2002) (same,

where prisoner's entire cell was doused in pepper spray using fire-extinguisher-like device); *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) (same, where officer indiscriminately sprayed entire prison tier).

Second, Eighth Amendment violations have also been found when a chemical agent was used without a prior verbal command, or after a prisoner had been subdued or had become compliant with an officer's instructions. *See Tedder v. Johnson*, ___ F. App'x ___, 2013 WL 2501759 (4th Cir. June 12, 2013) (stating that pepper spray employed on visibly sick inmate may constitute excessive force); *Johnson v. Blaukat*, 453 F.3d. 1108 (8th Cir. 2006) (finding triable Eighth Amendment claim where officers allegedly used pepper spray as a first resort without prior verbal command); *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002) (finding triable Eighth Amendment claim where there was evidence that inmate "did not intentionally disobey [officer], use profanity or abusive language, or threaten any correctional officer, and . . . was [pepper] sprayed without warning").

Finally, courts have concluded that the Eighth Amendment can be violated when, after a prisoner is pepper sprayed (even for a legitimate reason), officers then withhold appropriate medical attention. *See, e.g.*, *Walker v. Bowersox*, 526 F.3d. 1186, 1189 (8th Cir. 2008) (finding Eighth Amendment violation where prisoner was barred from showering or changing for three days after pepper spray incident); *Norton v. City of Marietta*, 432 F.3d 1145, 1153-54 (10th Cir. 2005) (finding triable Eighth Amendment claim where officer pepper sprayed inmate's eyes for 5-7 seconds from two inches away, as if "'he was spray-painting [plaintiff's] face,'" and then ignored inmate's pleas for assistance, other than "toss[ing] some water in his eyes"); *Foulk v. Charrier*, 262 F.3d 687 (8th Cir. 2001) (affirming Eighth Amendment verdict against officer where, after officer "sprayed pepper spray directly into [inmate's] face," inmate "received no

medical care and had no ability to wash off the pepper spray, [and] continued to feel its painful effects for several days").

The Fourth Circuit's 2008 decision in *Iko v. Shreve*, *supra*, 535 F.3d 225, involving use of pepper spray in extracting an inmate from his cell, illustrates each of the three categories. There, the Court observed that "some dispersal of pepper spray" was unquestionably "warranted in carrying out the cell extraction," because the inmate "did not initially comply with orders to 'cuff up.'" *Id.* at 239. Nevertheless, the *Iko* Court held that the defendant officer was not entitled to qualified immunity for his use of pepper spray because, in the light most favorable to the inmate, the officer "deployed several additional bursts of pepper spray even after [the inmate] attempted to comply with orders," *id.* at 239-40; the inmate was "docile and passive throughout the cell extraction," *id.* at 239; the officer's "final burst of pepper spray was deployed *after* [the inmate] had lain down on the floor of his cell," *id.* at 240 (emphasis in original); and, "far from trying to ameliorate the effects of the pepper spray, [the officer] and the extraction team never changed [the inmate's] clothing, never removed the spit mask covering his nose and mouth, and never secured him any medical treatment for the exposure." *Id.*

However, if an inmate repeatedly ignores official commands, multiple applications of pepper spray have been found reasonable. *See Williams*, 77 F.3d at 763 (finding no Eighth Amendment violation where officer administered pepper spray after prisoner asked "Why?" in response to command); *Jackson v. Morgan*, 19 F. App'x. 97, 102 (4th Cir. 2001) (upholding use of pepper spray twelve times when inmate refused to comply with commands to move from his cell); *Norris v. Detrick*, 918 F. Supp. 977, 984 (N.D.W. Va. 1996) (upholding use of two blasts of pepper spray when inmate refused to return to his cell during lockdown). Use of chemical agents is reasonable when a prisoner attempts to escape or evade an officer's control. *See*

*Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999).  Finally, use is also reasonable when an officer is attempting to maintain order and discipline in the institution.  *Santiago v. Walls*, 599 F.3d. 749, 757 (7th Cir. 2010) (determining that Eighth Amendment was not violated where pepper spray was used to break up inmate fight); *Combs v. Wilkinson*, 315 F.3d. 548, 558 (6th Cir. 2002) (holding use of pepper spray during prison riot appropriate).

Defendants deny that plaintiff was assaulted as alleged in the complaint.  Snyder and plaintiff's cellmate explain that Snyder attempted to handcuff Young prior to the opening of the cell door by Snyder.  The photographic evidence supports Snyder's statement that plaintiff slipped the handcuffs, which were found on the floor after the incident.  Parker, plaintiff's cell mate, recounted that Snyder and plaintiff exchanged words and immediately got into a physical altercation when the cell door was opened.  The need for application of force was occasioned by plaintiff's slipping his cuffs and fighting with Snyder, who acted to defend himself and to restore security.  Parker claimed that Snyder used his pepper spray immediately, whereas Snyder said he tried to use his pepper spray.  Although Parker's recollection is contradicted by others, the discrepancy is not material.  The use of pepper spray was clearly justified and, in any event, it did not result in ending the disturbance.  It was only when Thomas used pepper spray that the officers were able to subdue and cuff plaintiff.

Other officers were called to assist in subduing plaintiff.  When they arrived on the scene they observed Snyder on the ground and saw plaintiff punching him. The officers knocked plaintiff to the ground in order to stop the attack on Snyder and to gain control over plaintiff.  Plaintiff continued to resist efforts to subdue him and refused several orders to cease.  Ultimately, as noted, Thomas used pepper spray to gain plaintiff's compliance, and the officers were then able to restrain plaintiff.

Significantly, plaintiff was promptly escorted for medical treatment. The reports generated by the medical department, of a 3cm laceration to plaintiff's head, scratches on his forehead, and redness in his ears, are entirely consistent with defendants' version of events. Such injuries are also inconsistent with plaintiff's allegations that he was repeatedly stomped and kicked all over his body. The record evidence demonstrates that the responding officers used only that degree of force that was necessary to gain control over plaintiff.

The IIU investigation and the Hearing Officer at the adjustment proceeding arising from plaintiff's assaultive conduct found plaintiff's allegation that Snyder spontaneously assaulted him not credible. Moreover, plaintiff subsequently pled guilty in the District Court of Maryland for Washington County to the assault upon Snyder, belying his claim that he was defending himself from a spontaneous attack upon him by Snyder.

Defendants have shown that they responded to plaintiff's spontaneous assault upon Snyder; the force used by defendants to gain control of plaintiff was tempered; plaintiff's objective injuries were minor and inconsistent with his claims of brutality; and the defendants were required to respond in order to protect their fellow officer and to restore order and security to the institution. There is simply no evidence that any of the named defendants were acting maliciously or sadistically to cause harm to plaintiff.

Plaintiff, the non-moving party, must establish the existence of a genuine issue of material fact by presenting evidence on which a fact-finder could reasonably find in his favor. Plaintiff has failed to submit any evidence to support his claim, or to put the material fact of this case--the excessive use of force against plaintiff--in dispute. *See generally Gray v. Spillman*, 925 F.2d 90 (4th Cir. 1991).

To be sure, in connection with a motion for summary judgment, the court may not determine credibility. *Gray v. Spillman*, 925 F.2d at 95. But, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

In light of the foregoing, defendants Joshua Snyder, Shane Boggs, Ronald Mills, Steven Thomas, Cole Young, and Wesley Unger are entitled to summary judgment.

C.  NBCI claims

Plaintiff's claims regarding events at NBCI, in which he claims that he has been harassed and denied medical care, shall be dismissed, without prejudice. Plaintiff has not named any defendants employed at NBCI. The defendants named in the instant case are either supervisory officials or correctional officers employed at MCI-H, none of whom had anything to do with events transpiring at NBCI. Plaintiff is free to file a new complaint raising these claims and naming appropriate defendants and explaining how each named defendant was involved in the alleged unconstitutional activity.[10]

Conclusion

Defendants' motion for summary judgment will be granted as to plaintiff's claim of excessive force occurring on February 1, 2012 at MCI-H. Plaintiff's complaint regarding

---

[10]The court disagrees with defendants' contention that plaintiff failed to exhaust administrative remedies. Once a claim of excessive force is referred to IIU, an inmate is not permitted to continue his administrative remedies through the typical ARP process. Moreover, plaintiff indicates that he attempted to pursue administrative remedies but was prevented from doing so due to his transfer to a different institution. ECF 1. As such, under the circumstances, the court finds plaintiff exhausted "available" remedies regarding his claim of assault. Lastly, having found no constitutional violation, the court need not consider defendants' arguments regarding qualified immunity.

harassment and denial of medical care at NBCI shall be dismissed, without prejudice.    A

separate Order follows.


June 17, 2014                                             /s/
Date                                        Ellen L. Hollander
                                            United States District Judge